# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| RANDY ALLEN, STEPHANIE ALLEN, and MONICA ZAMBRANO, as parent and legal guardian of N.A., a minor, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:13-CV-0263-B |
| PATRICK W. TUTER et al., | § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Patrick W. Tuter's motion for summary judgment. Doc. 49. For the reasons stated below, the Court **GRANTS** Defendant's motion.

## I.

## BACKGROUND[1]

*A.     Factual Background*

This case arises from Michael Allen's death following a high-speed car chase. Allen's parents and his minor child filed suit under 42 U.S.C. § 1983 against the City of Garland, Texas and three Garland police officers. Doc. 46, Am. Compl. This motion concerns only plaintiffs' claim for excessive force in violation of the Fourth Amendment against Officer Patrick Tuter, the officer who shot and killed Allen. *Id.* ¶¶ 19–32.

---

[1] This factual background is drawn from the parties' summary-judgment evidence. The Court will note when facts are in dispute.

While on duty early on the morning of August 31, 2012, Tuter saw a white GMC pickup truck with no tailgate and a plastic truck box pass him while he was stopped in a parking lot. Doc. 53-1, Tuter Test., 47:22–48:1, 49:7–9.[2] The Sachse Police Department had issued a "be on the look out" (BOLO) because several nights prior a vehicle of the same description had evaded the Sachse police after the driver was pulled over. *Id.* 47:12–18. The BOLO identified Michael Allen as the driver of the pickup truck. *Id.* 48:11–14. Because of the BOLO, Tuter turned out of the parking lot and began following the truck, which Allen was driving. *Id.* 49:11–22. Tuter turned on his headlights, but he did not turn on his overhead lights or siren or attempt to pull Allen over. *Id.* He explained that, based on the information from the Sachse police, he believed the driver would flee, and he did not want to approach the vehicle without backup. *Id.* 50:18–25. So while Tuter waited for backup, Officer Norris, to arrive, he continued to follow Allen, who apparently kept to normal speeds and obeyed traffic signals. *Id.* 51:15–25. Once Norris radioed that he had arrived, Tuter turned on his overhead lights to initiate a traffic stop. *Id.* 52:8–9. The dashcam in Tuter's car begins recording thirty seconds before Tuter turns on his overhead lights. *Id.* 53:1–4. Thus, from this point on, the Court's recitation of the facts is drawn from Tuter's dashcam video.

Once Tuter turned on his overhead lights, Allen, traveling in the far right lane, signaled a right-hand turn as if to pull over, but then veered left across several lanes and made a left turn onto the intersecting road. Tuter Dashcam, VTS_01_1.VOB, :25–:28. Then, Allen accelerated, as did Tuter. *See id.* :32–:33. For a few minutes, Tuter followed Allen as he made several turns down two and three lane roads. *Id.* :31–4:00. At first, Tuter radioed that they were traveling about fifty to sixty

---

[2] The parties agreed to use testimony from Tuter's criminal trial as evidence in this case in lieu of discovery. Doc. 50, Br. in Supp., 1 n.1; Doc. 54, Resp., 1 n1.

miles per hour. *Id.* 1:15–:16; 2:25–:27. The dashcam video shows Allen ran at least one red light during this time. *Id.* :37, 1:35, 3:05. The dashcam video also shows, and Tuter radioed, that traffic was light. *Id.* :46, 2:24–:25, 2:50–:57. Then, about four minutes into the chase, Allen accelerated, and Tuter radioed that they were now traveling about one hundred miles per hour. *Id.* 4:00–:02. During this time, Allen ran at least two more red lights, *id.* 4:13, 4:36, and at one point swerved around three cars in front of him—only narrowly avoiding hitting them, *id.* 4:30–:33. Otherwise, traffic remained light to nonexistent. *See id.* 4:00–5:00.

Five minutes into the chase, Allen and Tuter entered Interstate 635. *Id.* 4:50. Tuter again radioed that they were traveling one hundred miles per hour. *Id.* 5:48–:49, 6:18–:19. Tuter also radioed that there was "light to no traffic." *Id.* 6:20–:22. After two minutes of traveling on Interstate 635, Allen exited the highway, made a u-turn on the frontage road, and reentered Interstate 635 traveling the opposite direction. *Id.* 6:38–7:13. He then took the exit for I-30 and traveled eastbound on I-30 for about one minute. *Id.* 7:37–8:17. Allen then exited I-30, drove through a red light, and reentered I-30. *Id.* 8:17–8:39. Although there is significant noise from Tuter's dispatch radio, Tuter does not seem to say how fast Allen was traveling. But Tuter testified that at one point while they were traveling on I-30 his speedometer hit 120 miles per hour. Doc. 53-1, Tuter Test. 66:21, 67:21. After two more minutes, Allen exited I-30 and made a right-hand turn onto a two-lane, residential road. Tuter Dashcam, VTS_01_1.VOB, 10:04–:20.

At this point, a Department of Public Safety (DPS) helicopter began following the chase. Video from the infrared camera in the helicopter recorded the remainder of the events from a birds-eye view. Tuter remained silent, but the flight safety officer aboard the DPS helicopter, Lieutenant

Lacey, estimated that Allen was traveling about seventy to eighty miles per hour. DPS Video, VTS 01_.1.VOB, 2:32–:33. There were no traffic lights on this road, but Allen drove through multiple stop signs without slowing. Tuter Dashcam, VTS_01_1.VOB, 11:47, 12:15, 13:12, 13:37, 14:16. The vehicles then reentered a business district and Allen drove through several more red lights. *Id.* 14:45, 16:04, 17:03. At one point, Allen made a left-hand turn onto a wide road divided by a median and drove down the wrong side of the road. *Id.* 18:32–20:00. Traffic remained light.

After twenty total minutes of pursuit, Allen turned left down a small residential street. *Id.* 20:06. Allen took a wide right turn and jumped the curb onto someone's lawn—narrowly missing the car parked in the driveway. *Id.* 21:14. After about a minute of driving through the neighborhood, Allen reached a cul-de-sac. Tuter Dashcam, VTS_01_.2.VOB, :22. He made a wide left arc, turned up a driveway, continued left across the strip of lawn separating that house from its neighbor, and drove onto the adjoining house's driveway. *Id.* :22–:25. When he was perpendicular on that driveway, Tuter's car advanced toward Allen and the front of Tuter's car hit the driver's side door of Allen's truck. *Id.* :25–:27. Plaintiffs contend that Tuter rammed his car into Allen's truck. Doc. 54, Resp., 3. Tuter says he "put his own squad car in harm's way," but Allen "refused to yield [s]o they collided." Doc. 50, Br. in Supp., 9. The collision caused Allen's truck to turn sharply to the left so that it faced down the driveway toward the street. DPS Video, VTS_01_.1.VOB, 14:06. Tuter's car continued to face the house. Tuter Dashcam, VTS_01_.2.VOB, :29–11:50. The dashcam video shows the front of the house and no subsequent events for the remainder of the recording. *Id.* Thus, the remainder of the facts are drawn from the DPS helicopter video and Officer Norris's dashcam video.

Allen's truck and Tuter's car appear to be connected along the driver's side of each vehicle. DPS Video, VTS_01_.1VOB, 14:06. Then, Tuter's car is dragged backwards down the driveway by Allen's truck as it moved down the driveway to the street. *Id.* 14:06–:09. When Allen reached the end of the driveway, Officer Norris rammed his car into the passenger side of Allen's truck, just in front of the passenger-side door. *Id.* 14:10–:11. Neither of the police cars nor Allen's truck moved, but Lieutenant Lacey noted that "the suspect is on the throttle hard." DPS Video, VTS_01_1.VOB, 14:15–:17. Immediately after the vehicles stopped moving, Lieutenant Lacey stated, "We've got muzzle flash. We may have shots fired." *Id.* 14:19. At what is likely the same point in time, Officer Norris's dashcam shows a bright light emanating from the far side of Allen's truck where Tuter's car was and broadcasts what sounds like gunshots. Norris Dashcam, VTS_01_2.VOB, :25–:31. The air quickly became clouded with that looks like smoke. *Id.* And it sounds like someone said "Shots fired." *Id.* :31. The DPS video shows what looks like sparks shoot out from the right rear tire of Allen's truck and the back-left side of the truck, where Tuter's car was still connected to Allen's truck. DPS Video, VTS_01_.1.VOB, 14:32–:34.

Tuter's car then pulled away from Allen's truck and drove forward onto the driveway. *Id.* 14:34–:37. Then someone on the DPS radio said, "Shots are fired." *Id.* 14:40–:43. The video shows sparks flying out of both rear sides of Allen's car. *Id.* 14:40–:46. The video briefly switched to a daytime view, rather than infrared, which revealed that Allen's truck and Tuter's car were no longer connected. *Id.* 14:43. There was smoke pluming around the back, right side, and front of Allen's truck. *Id.* Tuter exited his car. *Id.* 14:46. Then, the camera swung away so that the vehicles were out of view and switched back to daytime view. *Id.* 14:47. Tuter pointed his gun at the back rear window

of Tuter's truck. *Id*. Tuter described what happened next as "Allen's truck [ ] swerving right at [him]." *Id*. 14:47–51. The video shows muzzle fire. *Id*. Then, Lieutenant Lacey said, "This is still a dynamic scene. He's still laying on the throttle." *Id*. 14:53–:55. The dashcam in Officer Norris's car confirms that forty seconds after Officer Norris rammed Allen's truck, the back of Allen's truck swung slightly away from Officer Norris's car so that the front of Officer Norris's car was no longer flush with the right front wheel well of Allen's truck. Norris Dashcam,VTS_01_2.VOB, 1:00–1:02. This could be the same movement Tuter describes as Allen swerving at him. As Allen's truck swung away from Officer Norris's car, Allen's head swung from his left shoulder to his right shoulder. *Id*.

Tuter then walked down the driveway to his left and stood in front of Allen's truck with his weapon drawn. DPS Video, VTS_01_1.VOB, 15:00–:25. At least four additional police officers surrounded Allen's truck. *Id*. 15:33. An officer opened the passenger side door of Allen's truck, and a female passenger exited the truck. *Id*. 16:18–:24. Officers continued to advance toward Allen's truck and someone on the radio in the DPS helicopter said what sounds like, "I repeat, he's been hit. He's been fired at?" DPS Video, VTS_01_2.VOB, :15–:18. Then someone else said, "Everybody stay back. We're deploying a dog." *Id*. :23–:25. An officer guided a dog into the passenger-side door of Allen's truck. :50–:55. At that point at least nine officers surrounded Allen's truck. *Id*. :49. The dog then extracted Allen head first through the passenger side door. *Id*. 1:30–:36. For the remainder of the recording, the camera continued to circle over the scene as Allen lay face down on the street and several officers stood over him. *See id*. 1:38–5:41.

B.  *Procedural Background*

On January 21, 2013, Plaintiff filed suit. Doc. 1, Compl. On July 2, 2013, the Court granted

the parties' motion to stay proceedings pending parallel criminal proceedings against Tuter. Doc. 20, Order. During Tuter's criminal proceedings, the Court ordered this case consolidated with Plaintiffs' case against the City of Garland and other Garland police officers. Doc 33, Order. On October 20, 2017, the parties informed the Court that the criminal proceedings against Tuter had concluded. Doc. 36, Am. Status Report. Thus, the Court directed Tuter to file either a motion to dismiss or a motion for summary judgment regarding his qualified immunity defense. Doc. 44, Order. The Court stayed the proceedings against the other defendants until resolution of Tuter's motion. *Id*. On March 8, 2018, Tuter filed the present motion for summary judgment. Doc. 49, Mot. for Summ. J. Tuter's motion is ripe for review.

## II.

## LEGAL STANDARD

Courts must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007). And a fact "is 'material' if its resolution could affect the outcome of the action." *Id.*

The summary-judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). So the movant must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks

omitted). Once the movant has produced evidence on an element or claim or alleged the non-movant has no evidence, the non-movant must "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim" to show that a fact issue exists. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). And although the Court views evidence in the light most favorable to the non-movant when determining whether a genuine issue exists, *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000), mere "metaphysical doubt as to material facts," "conclusory allegations," "unsubstantiated assertions," or a mere "scintilla of evidence" will not save a non-movant from summary judgment, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam)(internal citations and quotation marks omitted).

## III.

## ANALYSIS

Under 42 U.S.C. § 1983, a person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" who violates another person's constitutional rights is liable to the person whose rights he violated. The Plaintiffs sued Tuter under § 1983 in his individual capacity, claiming that he violated Allen's Fourth Amendment rights by subjecting him to excessive force. Doc. 49, Am. Compl., ¶¶ 29–32.

But police officers have qualified immunity, which shields them from liability unless: (1) "'a constitutional right would have been violated on the facts alleged'" and (2) "'the right was clearly established' at the time of the violation." *Kitchen v. Dall. Cty.*, 759 F.3d 468, 476 (5th Cir. 2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)). Courts have discretion in deciding which of the two prongs should be addressed first. *Id*. Here, the Court finds it appropriate to consider the

constitutional question first. Thus, the Court will first determine whether Tuter used excessive force. If so, the Court will evaluate whether qualified immunity bars the Plaintiffs' claim.

1. Excessive Force

Tuter argues that he did not violate the Fourth Amendment because he acted reasonably in applying deadly force to stop a fleeing felon. Doc. 50, Br. in Supp., 15–17. Tuter relies on *Plumhoff v. Rickard*, in which the Supreme Court found that police officers did not violate the Fourth Amendment when they fatally shot a suspect who was momentarily cornered during a high speed chase. *Id.*; 134 S. Ct. 2012, 2017–18 (2014). Tuter claims that, just like the driver in *Plumhoff*, Allen attempted to escape after he was hit by Tuter's and Noriss's cars. Doc. 50, Br. in Supp., 15. Tuter also claims that Allen swerved his truck at Tuter. *Id.* at 11–12. Therefore, Tuter argues that because there was an ongoing risk of harm to the public and himself he was justified in using deadly force to abate those risks. *Id.* at 19.

Plaintiffs dispute that Allen was an ongoing threat. Plaintiffs claim that after Tuter and Norris hit Allen's truck, the truck was immobilized. Doc. 54, Resp., 13–14. Plaintiffs do not dispute that, like the suspect's car in *Plumhoff*, Allen's tires continued to spin after the officers struck his truck. *Id.* at 15. But Plaintiffs urge that spinning tires alone are insufficient to demonstrate risk of further flight. *Id.* So Plaintiffs claim that whether Allen was attempting to flee at the time Tuter fatally shot him is a genuine issue of material fact precluding a grant of summary judgment. *Id.* at 13–14. Plaintiffs also claim that Allen did not pose a threat to Tuter because when Allen's car fishtailed it moved away from Tuter, not at him. *Id.* at 19.

The Fourth Amendment confers the right to be free from unreasonable searches and seizures.

U.S. Const. amend. IV. A seizure is unreasonable if it involves excessive force. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). To prevail on a Fourth Amendment excessive-force claim, a plaintiff must prove she suffered (1) an injury (2) resulting directly and only from (3) an officer's use of objectively unreasonable force. *Ikerd v. Blair*, 101 F.3d 430, 433–34 (5th Cir. 1996). "[D]etermining the objective reasonableness . . . 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Plumhoff*, 134 S.Ct. at 2020 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). When balancing these competing interests, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013). If a suspect is evading arrest by flight, the threat to pedestrians, other motorists, and the police officers involved in the chase may justify the use of deadly force "even when it places the fleeing motorist at risk of serious injury or death." *Plumhoff*, 134 S. Ct at 2021 (quoting *Scott v. Harris*, 550 U.S. 372, 386 (2007)). But when "justification for the use of force has ceased" an exercise of force may become unreasonable. *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 413 (5th Cir. 2009). The objective reasonableness standard "requires analyzing the totality of the circumstances," *Plumhoff*, 134 S. Ct. at 2020, "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396.

Here, the Court must determine whether under the Fourth Amendment's objective reasonableness standard an officer on the scene would perceive that the high-speed chase had ended. If it is clear under the totality of the circumstances that Allen was no longer a threat, then Tuter's

use of deadly force was not justified. But if the chase had not ended, then Tuter was justified in shooting at Allen "in order to end a severe threat to public safety." *Plumhoff*, 134 S. Ct. at 2022.

The Court finds that there is a genuine issue of material fact about whether an officer on the scene would perceive that the chase had ended. On one hand, there is evidence that a reasonable officer would have concluded that Allen attempted to flee after the officers rammed his truck. For example, on the DPS video, Lieutenant Lacey states that "the suspect is on the throttle" right before Tuter fires the first rounds of shots, DPS Video, VTS_01_1.VOB, 14:14–:16, and that "this is still a dynamic scene. He's still laying on the throttle," right after Tuter fired the last round of shots. *Id*. 14:54–:56. And the video shows sparks and white light emanating from Allen's truck, which Tuter contends is evidence that Allen's wheels were spinning throughout the encounter. *Id*. 14:11–:55. Lieutenant Lacey testified that the white light could indicate spinning tires. Doc. 51-2, Lacey Test., 52:9–16.

But on the other hand, the DPS video shows light emanating from under the officers' cars too. *See* DPS Video, VTS_01_1.VOB 14:11–:55. Thus, the white light does not clearly show that Allen was attempting to flee. And the DPS video shows that after Office Norris rammed his car into Allen's truck, and before Tuter fired any shots, Allen's car did not move again except for when it fishtailed as Tuter was standing behind the truck. *Id*. 14:47–:50. The fact that Allen's car remained almost completely still during the entire time Tuter fired shots could indicate that a reasonable officer would have perceived that the chase had ended.

Nor is *Plumhoff* dispositive. In *Plumhoff*, the Supreme Court found that police officers did not violate the Fourth Amendment by fatally shooting a suspect after a high-speed chase because "during

the 10-second span when all the shots were fired, [the suspect] never abandoned his attempt to flee." *Plumhoff*, 134 S. Ct. at 2022. The suspect had lead the police on a chase that "exceed 100 miles per house and lasted over five minutes." *Id.* at 2021. The suspect's car then collided with a police car and came to a standstill for three seconds. *Id.* Then, the suspect pushed down on the accelerator so that his tires spun, managed to break free from the police car with which he had collided, "threw the car into reverse," and drove away. *Id.* at 2021–22. The officers fired three shots while the suspect was trying to break free and twelve more shots as he drove away. *Id.* at 2017–18. The Court found that "all that a reasonable police officer could have concluded was that . . . [the suspect] would once again pose a deadly threat for others on the road." *Id.* at 2022. Thus, the police officers were justified in firing at the suspect and were not required to cease firing until the threat had ended. *Id.*

The key difference between *Plumhoff* and this case is the duration of the suspect's encounter with the police and the amount of time the suspect's vehicle remained at a standstill. In *Plumhoff*, the entire encounter took only ten seconds and the suspect's car stopped for only three seconds. *Id.* at 2021. Here, it took about fifty seconds from when Tuter rammed Allen's truck for Tuter to finish firing the last round of shots, DPS Video, VTS_01_1.VOB, 14:06–:56, and Allen's car did not move for about forty seconds of that time. *Id.* 14:13–:56. Although a fifty-second encounter is not much longer than a ten second one, the difference in duration is significant. Indeed, the Fifth Circuit has found a fact issue about a smaller difference in time sufficient to deny summary judgment. *See Lytle*, 560 F.3d at 414 (finding that whether the officer shot at a vehicle contemporaneously to when the vehicle reversed toward the office or "three to ten, perhaps even more" seconds after that precluded a finding that the officer acted objectively reasonably). And although Allen remained on the throttle

while Tuter fired all rounds of shots, the Court declines to read *Plumhoff* to hold that spinning tires—independent of other circumstances—evinces an intent to flee such that deadly force is justified as long as the tires remain spinning. A court must apply the objective reasonableness standard by analyzing the totality of the circumstances. *Plumhoff*, 134 S. Ct., at 2020. Thus, the Court finds a genuine issue of material fact about whether an objectively reasonable officer would have perceived that the chase was ongoing each time Tuter fired at Allen.

That does not end the inquiry though, because Tuter also claims that when he was positioned behind Allen's truck, Allen swung the back of his truck toward Tuter.[3] Doc. 50, Br. in Supp., 12. Thus, Tuter claims he was justified in using deadly force not only because of the threat to public safety if Allen continued to flee but also because of the threat to himself. *Id.* at 19. But there is a genuine issue of material fact about whether a reasonable officer would have perceived that Allen was attempting to hit Tuter with his truck. Plaintiffs claim the truck moved away from Tuter, but the DPS video shows Allen's truck moving from directly in front of Tuter to Tuter's left side. DPS Video, VTS_01_1.VOB, 14:49–:51. And when the plaintiffs' version of the facts is belied by video evidence the court need not rely on the plaintiffs' characterization. *Poole v. City of Shreveport*, 691 F.3d 624, 631 (5th Cir. 2012). But the video evidence is not conclusive. The camera focuses on the truck for only two seconds before swinging to the left so that neither the truck nor Tuter is in view. DPS Video, VTS_01_1.VOB, 14:49–:51. And for the two seconds the camera is focused on Tuter,

---

[3] Plaintiffs note that in Tuter's criminal trial, Tuter claimed that after his and Allen's vehicles collided he saw Allen reach down and to his right and thought that Allen was reaching for a gun. Doc. 54, Resp., 14. Plaintiffs argue that there is no evidence Allen reached for a weapon; in fact, Allen was unarmed. *Id.* But in his motion, Tuter does not argue that he believed Allen was armed. Thus, the Court declines to address the issue.

smoke enveloped Tuter and the truck, and the camera was shaky. *Id.* Thus, the video does not show exactly how close Tuter was to the truck, the distance the truck traveled, or if the truck moved closer to Tuter or just from his right to left side. Therefore, the Court cannot determine as a matter of law whether a reasonable officer would have perceived a threat to himself.

3. Qualified Immunity

But even though issues of material fact preclude the Court from deciding whether Tuter violated Allen's Fourth Amendment rights, the Court finds summary judgment appropriate because Tuter is entitled to qualified immunity even if he violated Allen's Fourth Amendment rights.

Police officers are entitled to qualified immunity unless "a reasonable officer would have known that his conduct violated the constitution." *Lytle*, 560 F.3d at 410. This doctrine "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Pasco ex rel Pasco v. Knoblauch*, 566 F.3d 572, 581 (5th Cir. 2009) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Thus, it "shields officers' decisions made in the context of fast-paced, tense, and difficult circumstances . . . and served to 'protect officers from the sometimes hazy border between excessive and acceptable force.'" *Estate of Shaw v. Sierra*, 3:08-CV-1737-N, 2009 WL 10703108, at *4 (N.D. Tex. Sept. 1, 2009) (quoting *Saucier*, 533 U.S. at 194). To overcome this defense, Plaintiffs must point to a "particular right so clearly established that the official had fair notice of that right and its concomitant legal obligations." *Thompson v. Mercer*, 762 F.3d 433, 441 (5th Cir. 2014). "This right must be articulated 'in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Saucier,* 533 U.S. at 201).

It is Plaintiffs' burden to identify the clearly established, particular right that Tuter allegedly

violated. *Thompson*, 762 F.3d at 441. Plaintiffs urge that at the time of the events, it was clearly established that "'where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.'" Doc. 54, Resp., 19 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). Plaintiffs also state that "officers must assess not only the need for force but also 'the relationship between the need and the amount of force used.'" *Id*. at 16 (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)).

Although "[t]he law can be clearly established despite notable factual distinctions between the precedents relied on and the case[] before the Court . . . the prior decisions [must] g[i]ve reasonable warning that the conduct then at issue violated constitutional rights." *Lytle*, 560 F.3d at 417 (internal quotation omitted). The prior decisions on which Plaintiffs rely, *Garner* and *Gomez*, do not give reasonable warning that Tuter's conduct violated Allen's constitutional rights because the facts in those cases are substantially different from the facts here. In *Garner*, the Supreme Court denied qualified immunity to an officer who shot Garner as he climbed over a fence after fleeing the scene of a robbery on foot. *Garner* 471 U.S. at 4. In addition, the Supreme Court subsequently found that *Garner* was "cast at a high level of generality." *Brosseau v. Haugan*, 543 U.S. 194, 199 (2004). And in Gomez, the Fifth Circuit denied qualified immunity when a prisoner alleged that correctional officers used excessive force by throwing him to the floor and beating him without provocation. *Gomez*, 163 F.3d at 922. In short, Plaintiffs do not point to any case that speaks to the "reasonableness of lethal force as a response to vehicular flight." *Plumhoff*, 134 S. Ct. at 2023. Thus, Plaintiffs fail to identify a "particular right so clearly established that the official had fair notice of that right and its concomitant legal obligations." *Thompson*, 762 F.3d at 441.

The Court finds that when Tuter shot Allen, it was not clearly unconstitutional for a police officer to use deadly force against a suspect fleeing in a motor vehicle. *Brosseau,* 543 U.S. at 197–98. Instead, whether the officer was justified in using deadly force depended on the severity of the threat posed by the fleeing motorist. *Lytle,* 560 F.3d at 414–16. For example, in *Lytle*, the Fifth Circuit explained that other courts had found deadly force justifiable when "the suspect led police on a fifty-mile chase exceeding speeds of ninety miles per hour . . . and forced over one hundred vehicles out of its way," and when "the suspect led police on an eight mile chase during which he committed numerous traffic violations and ran another motorist off the road." 560 F.3d at 415 (internal quotations and citations omitted). In those cases, the suspect's actions indicated a threat of harm to the public and other officers sufficiently severe to warrant the use of deadly force. *Lytle*, 560 F.3d at 415. In contrast, other courts found deadly force unjustified when "a suspect had led the police on a chase, largely within the speed limit, for over an hour," and when "suspects . . . had accelerated to eighty to eighty-five miles per hour in a seventy-miles-per-hour zone in an attempt to avoid capture." *Id.* at 415–16 (internal quotations and citations omitted). In those cases, "the driver posed a lesser risk of harm to others." *Id.* at 415.

So clearly established law allowed an officer to determine, based on the circumstances of the car chase at issue, whether it was constitutional to use deadly force to stop a fleeing suspect.[4] But that

---

[4] In all of the cases the *Lytle* court cites, the suspect was actively fleeing when the police used deadly force. *See, e.g.*, *Abney v. Coe,* 493 F.3d 412, 414–15, 418 (4th Cir. 2007); (finding police officer did not act objectively unreasonably by ramming his squad car into the back of a fleeing motorcyclist); *Cole v. Bone*, 993 F.2d 1328, 1331, 33 (8th Cir. 1993)(finding it was not objectively unreasonable to shoot the suspect as the suspect was driving down the interstate). The same was true in *Brosseau*. 543 U.S. at 197–98 (finding Officer Brosseau did not violate a clearly established right when she shot the defendant who jumped into his car, started it, and began to drive away after evading Brosseau on foot).

is not the situation here. And none of the cases cited above speak to whether it was constitutional to use deadly force when it was unclear if a suspect was fleeing,[5] and thus if the threat was severe or nonexistent.

If Tuter had shot Allen while Allen was actively fleeing, Tuter would have been justified in using deadly force because Allen posed a sever threat to the safety of the public. Allen lead the police on a chase during which he reached speeds of at least 100 miles per hour and ran numerous red lights and stop signs. *See, e.g.*, DPS Video, VTS_01_.1.VOB, 4:00–:36. And although traffic was light, *see e.g., id.* 4:00–5:00, Allen swerved around several cars and across someone's lawn while evading the police, *id*. 21:14. But Allen was not actively fleeing the police when Tuter shot him. And an objectively reasonable officer might have concluded that a suspect who was not actively fleeing but possibly attempting to flee posed a lesser threat such that deadly force was not justified. Either way though, Plaintiffs have not pointed to, and the Court has not found, a case that clearly establishes that Tuter's conduct violated the Fourth Amendment. At the very least, Tuter's conduct fell in the sometimes hazy border between excessive and acceptable force. *Estate of Shaw,* WL 10703108, at *4. Thus, because there was no clearly established right such that Tuter would have known his conduct violated the constitution, he is entitled to qualified immunity.

## IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Tuter's motion for summary judgment.

---

[5]The Court has already found, and Plaintiffs concede, genuine issues of material fact about whether Allen was attempting to flee, *see* Doc. 50, Resp., 14, 19. Thus, for the purposes of the qualified immunity analysis, the Court considers the facts to be that it was unclear whether Allen posed a flight risk.

SO ORDERED.

SIGNED: June 29, 2018.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE